UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

_____

UNITED STATES OF AMERICA,                CRIMINAL ACTION

        Plaintiff            Docket No:2:13-cr-114-NT


    -versus-


MICHEL D'ANGELO,

       Defendant

_____


Transcript of Proceedings



Pursuant to notice, the above-entitled matter came on for **Sentencing** held before **THE HONORABLE NANCY TORRESEN,** United States District Judge, in the United States District Court, Edward T. Gignoux Courthouse, 156 Federal Street, Portland, Maine on the 20th day of June, 2014 at 9:00 a.m. as follows:


Appearances:

For the Government:  Darcie N. McElwee, Esquire
                    Assistant United States Attorney

For the Defendant:  David J. Van Dyke, Esquire


Dennis R. Ford
Official Court Reporter

(Prepared from manual stenography and
computer aided transcription)

```
 1                    (Open court.  Defendant present.)
 2              THE COURT:  Good morning.
 3              MS. MCELWEE:  Good morning, Your Honor.
 4              MR. VAN DYKE:  Good morning, Your Honor.
 5              THE COURT:  The Court has before it for
 6    determination and imposition of sentence United States
 7    versus Michel D'Angelo, docket number 13-114-NT.  Will
 8    counsel please enter their appearances.
 9              MS. MCELWEE:  Good morning, Your Honor.
10    Darcie McElwee, Assistant U.S. Attorney for the United
11    States.
12              MR. VAN DYKE:  David Van Dyke for defendant
13    D'Angelo.
14              THE COURT:  Good morning, Mr. Van Dyke.  I
15    would like to see counsel at sidebar.
16              MS. MCELWEE:  Thank you, Judge.
17      (Sidebar conference ordered sealed by the Court).
18              THE COURT:  All right.  Ms. McElwee, have the
19    victims received notification?
20              MS. MCELWEE:  They have, Your Honor.
21              THE COURT:  And are there any present here to
22    be heard?
23              MS. MCELWEE:  There are, Your Honor.
24              THE COURT:  All right.  We'll get to that in a
25    moment.  Thank you.  Sir, your name is Michael
```

1    D'Angelo?

2          THE DEFENDANT:  Michel D'Angelo, ma'am.

3          THE COURT:  And are you the defendant named in

4    the indictment before the Court?

5          THE DEFENDANT:  Yes, I am.

6          THE COURT:  How far did you go in school?

7          THE DEFENDANT:  I have a GED, Your Honor.

8          THE COURT:  And have you used any alcohol or

9    drugs within the last 24 hours?

10          THE DEFENDANT:  No, ma'am.

11          THE COURT:  Do you understand why you are here

12    today?

13          THE DEFENDANT:  Yes, ma'am.

14          THE COURT:  I find the defendant competent to

15    be sentenced today.  I see you're here with your

16    counsel, Mr. Van Dyke.

17          THE DEFENDANT:  Yes, ma'am.

18          THE COURT:  Do you authorize Mr. Van Dyke to

19    speak on your behalf in today's proceedings?

20          THE DEFENDANT:  I do.

21          THE COURT:  And Mr. Van Dyke, has the

22    defendant received a copy of the written presentence

23    report?

24          MR. VAN DYKE:  Both of them, yes.

25          THE COURT:  All right.  And have you had

```
 1    enough time to discuss the reports with him?

 2              MR. VAN DYKE:  Yes.

 3              THE COURT:  Mr. D'Angelo, have you read -- and

 4    I'm going to refer to the revised report dated 5/21/14.

 5    Have you had an opportunity to read the revised

 6    presentence investigation report?

 7              THE DEFENDANT:  Yes, ma'am, I have.

 8              THE COURT:  Do you know and understand

 9    everything that's in this report?

10              THE DEFENDANT:  I do.

11              THE COURT:  And you've had an opportunity to

12    talk with your counsel about this report?

13              THE DEFENDANT:  I have.

14              THE COURT:  All right.  This is important.  To

15    the extent that I accept the contents of this report as

16    true, it becomes the facts upon which I base my

17    sentence.  Is there anything that's contained in this

18    report that you believe is inaccurate or false in any

19    way?

20              THE DEFENDANT:  There's a couple of things,

21    Your Honor.

22              THE COURT:  Can we go through those now then

23    and you can let me know what you're contesting.

24              THE DEFENDANT:  Okay.

25              THE COURT:  And your counsel can help you if
```

1    you forget something along the way.

2          THE DEFENDANT:  Well, yeah.  The allegation

3    that I possessed a screwdriver, definitely contest

4    that.

5          THE COURT:  Um-hmm.

6          THE DEFENDANT:  And --

7          (Discussion off the record between the

8    defendant and counsel).

9          MR. VAN DYKE:  And Your Honor, there were a

10    number of other matters that were raised to me that

11    made their way into the objections, that made their way

12    to the report.

13          THE COURT:  All right.  So the only thing

14    that's left in this report then would be that

15    allegation regarding the screwdriver?

16          THE DEFENDANT:  Yes, Your Honor.

17          THE COURT:  I mean I understand there was --

18    at your Rule 11 when you changed your plea to guilty,

19    you corrected the prosecution version and you said that

20    you didn't have any memory of making a threat and that

21    you didn't have any intention of making a threat, and I

22    think that's pretty much spelled out in here, but

23    you're also preserving that.  I just want you to know

24    that.

25      I take it you're still taking the position that

1        you didn't have any memory of making a threat.

2              THE DEFENDANT:  Yes.  I just don't recall.

3              THE COURT:  All right.  And aside from those

4        two issues then, is that -- pretty much everything else

5        in this report is accurate?

6              THE DEFENDANT:  Yes, Your Honor.

7              THE COURT:  All right.  You can have a seat,

8        sir.  Mr. Van Dyke, you're going to have to stand up.

9        There are a few legal issues that are -- that have to

10       be resolved and I want to do those first.

11          There's an objection to the application of the

12       enhancement for obstruction of justice.  There's an

13       objection to the failure to apply acceptance of

14       responsibility, and I take it there's an objection to

15       the use of a weapon during the offense.

16             MR. VAN DYKE:  Correct.

17             THE COURT:  Now, both the obstruction and the

18       use of a weapon don't really have any ultimate effect

19       on the adjusted offense level --

20             MR. VAN DYKE:  That's right.

21             THE COURT:  -- because of the career offender

22       and I understand -- but they may have some relevance as

23       to whether acceptance or responsibility is to be given.

24       That's my understanding; is that fair?

25             MR. VAN DYKE:  Yes, Your Honor.

1          MS. MCELWEE:  Yes, Your Honor.

2          THE COURT:  All right.  So how does counsel

3     wish to proceed with that?

4          MS. MCELWEE:  I have a number of exhibits in

5     writing, Judge, to offer, for which I don't believe

6     there is any objection to their admission.

7          THE COURT:  All right.

8          MS. MCELWEE:  There being admitted.

9          THE COURT:  And do you want to argue that?  I

10    have reviewed the defendant's supplemental memo.

11         MR. VAN DYKE:  I think brief argument might be

12    helpful to frame the Court's thinking.

13         THE COURT:  Okay, that sounds good.  So do you

14    want to go ahead, Ms. McElwee?

15         MS. MCELWEE:  Yes, I'll offer them.  What I

16    have for exhibits, Judge, the first is 1-A and 1-B,

17    which are the proffer reports of co-defendant Jennica

18    Miller, which the parties decided to offer in lieu of

19    her testimony.

20         THE COURT:  All right.

21         (Exhibits handed to the Court).

22         MS. MCELWEE:  And specifically, those relate

23    to two forums.  First, to the fact that we're alleging

24    he carried a screwdriver; second, that we're alleging

25    he made a threat and confirmed having made the threat

1   to Ms. Miller.

2        And then alternatively, I offer them to be

3   considered for the other conduct that's described

4   under -- generally the sentence you impose with respect

5   to the factors under Title 18, section 3553(a).

6             THE COURT:  All right.  Do you want to take me

7   through to where it is that it says that so I can --

8             MS. MCELWEE:  If you look at the -- do you

9   want me to highlight it for you?

10            THE COURT:  No, just tell me.

11            MS. MCELWEE:  The second page, I believe.

12            THE COURT:  On 1-A?

13            MS. MCELWEE:  Yes, they are both 1-A, where

14  Agent McDonald highlights the Kennebunk Savings robbery

15  under the heading.

16            THE COURT:  Yes.

17            MS. MCELWEE:  And not -- I think it's the

18  second or third paragraph under that.  She describes

19  that he carried a screwdriver in his pocket and

20  corroborates having made a threat to the tellers in the

21  bank.  They're right near each other.

22            THE COURT:  All right.

23            MS. MCELWEE:  The next exhibit I have is

24  Government's Exhibit 2, which contains four letters the

25  Court has likely previously seen, which were letters

1    that we allege were sent by Mr. D'Angelo to Jennica

2    Miller while he was incarcerated.

3           (Exhibit handed to the Court).

4      And the Government offers those, Judge, as proof

5    of obstruction.

6           THE COURT:  All right.  Let me back up a

7    minute.  I don't know if I asked you this, Mr. Van

8    Dyke; do you have any objection to Government's

9    Exhibits 1-A or B?

10           MR. VAN DYKE:  Um, well, there was a

11    discussion regarding the Government's option of

12    bringing Ms. Miller live and we agreed that rather than

13    have Ms. Miller appear live, we would allow the

14    Government to submit the proffer.

15      So with regard to my agreement that that happen, I

16    do not object to the admission.  I understand the Court

17    did see those in connection with a prior proceeding.

18           THE COURT:  Yes.  I certainly saw Government's

19    2, but I'm not even sure I did see 1-A and 1-B.

20           MS. MCELWEE:  You should have, Judge.

21           THE COURT:  I probably did.  I just don't

22    remember it.

23           MS. MCELWEE:  Right.

24           THE COURT:  All right.  So Government's

25    Exhibits 1-A and 1-B are admitted.  And then with

1  regard to Government's 2, do you have any objection to

2  that?

3          MR. VAN DYKE:  No, I do not have any

4  objection.

5          THE COURT:  And I have some questions for you.

6  Maybe you're going to talk about these letters now

7  or --

8          MS. MCELWEE:  No.  I think Ms. Hodgdon

9  appropriately and succinctly described them in the

10  presentence report in Paragraph 6 where she pulled out

11  the relevant statements that support the allegation of

12  obstruction.

13          THE COURT:  All right.  I guess my question

14  related to that first letter was addressed to Tonya.

15          MS. MCELWEE:  Right.  If you recall, Judge, we

16  talked about that in the context of Ms. Miller's case

17  and if you look through each of the envelopes, it's all

18  the same handwriting and Mr. D'Angelo entitled them

19  with different names, and actually goes on to describe

20  one of the letters, as Ms. Hodgdon describes in

21  Paragraph 6, that he can just use a bogus name and he's

22  telling her how to do the same so that she can write

23  back to him.

24          And then if you read the context of the letters

25  and the content of the letters, it's clear, based on

1   what's said -- and that's actually the ruling you made

2   in that case -- is that you could conclude that those

3   were written by him.

4        THE COURT:  Well, I think I might be able to

5   conclude that, but the first one that says, hi, Tonya.

6   He's talking about the pain of losing Jen.

7        MS. MCELWEE:  Right.

8        THE COURT:  And I don't think you would say

9   that to Jen in that fashion.  It seems to be he's

10  talking to somebody else here.

11       MS. MCELWEE:  I see.  Those letters were all

12  sent to Ms. Miller.  Those were provided to me through

13  Ms. Miller.

14       THE COURT:  Did you want to say something, Mr.

15  Van Dyke?

16       MR. VAN DYKE:  Yes, Your Honor.  We do not

17  contest that Jen wrote -- authored the letters and that

18  they were intended for Ms. Miller.  It's all pre-plea

19  conduct and we don't contest that.  That's the issue

20  the Court's faces.

21       MS. MCELWEE:  And just to clarify, Judge,

22  because I understand what you're saying now, my

23  submission to you would be that he wrote it that way so

24  that the message of his sadness would be relayed to

25  her, but anyone reading the letter wouldn't think it

1    had been written by -- to her.  In other words, he

2    wasn't supposed to have contact with her, he entitled

3    the letter to somebody else, but then spoke about his

4    love of her, that he would be able to say he sent it to

5    somebody else.

6            THE COURT:  All right.  Well, the first

7    letter, in any event, doesn't have any of that language

8    that was sort of flagged as being obstructionist; is

9    that right?

10           MS. MCELWEE:  That's correct.  I just want to

11   be thorough in what we offered.

12           THE COURT:  Right.  It did strike me that he

13   was writing to someone else there, but it doesn't

14   matter.  All right.

15           MS. MCELWEE:  And then the last packet I have

16   for you, Judge, Government's Exhibit 3, which is the

17   incident reports that I received from the York County

18   Sheriff's Office and the Cumberland County Sheriff's

19   Office, which detail many of the incidents that Ms.

20   Hodgdon again did a great job succinctly describing in

21   Paragraphs 5 -- I guess just 5, which I would submit

22   support our argument that he should not receive

23   acceptance because he's failed to withdraw from

24   criminal conduct.

25        I recognize the defendant is suggesting that most

1    of this took place prior to plea, but I don't know that

2    that makes a difference.  It doesn't make a difference

3    to the Government's position.

4            THE COURT:  All right.  And Mr. Van Dyke, once

5    again, do you have any objection to Government's 3?

6            MR. VAN DYKE:  I do not.

7            (Exhibit handed to the Court).

8            THE COURT:  All right.  Ms. McElwee, go ahead

9    and make your argument.

10           MS. MCELWEE:  Thank you, Judge.  So the first

11   issue is whether or not the Government can prove by a

12   preponderance that the defendant, in fact, carried a

13   dangerous weapon with him during the crime as alleged

14   in Paragraph 22 of the presentence report.

15       If you look at Government's Exhibit 1-A, Ms.

16   Miller proffered that, in fact, the defendant did carry

17   a screwdriver.  And if you look at Paragraph 10 in the

18   presentence report, a screwdriver was found in the car

19   during the search -- excuse me, no, a screwdriver was

20   essentially abandoned on the side of the road along

21   with the other items that we allege the defendant --

22   and he acknowledged at his plea -- that he wore during

23   the crime.

24       So that along with the bleach soaked pink tank

25   top, red sweatshirt, pair of sweatpants, pink hat had

1    been cut open which he wore around his neck to cover

2    his tattoos, a long brown wig, two black and white

3    striped socks which were stuffed in the bra, the bra

4    itself and the screwdriver.  It's alleged that that's

5    also further evidence to support a preponderance

6    finding that he carried a screwdriver because it was

7    discarded with the other items that he wore to cover

8    his -- to disguise himself.

9         With regard to whether or not the defendant made a

10   threat or not, which affects Paragraph --

11        THE COURT:  Let me ask this, Mr. Van Dyke, is

12   the defendant even disputing that he did make a threat?

13   He's just -- what he's saying is he can't remember.

14        MR. VAN DYKE:  Yeah.  The discovery in the

15   case -- that during the robbery, there was a

16   conversation about I have a bomb and he didn't mention

17   a screwdriver, and that was apparently relayed by one

18   or more tellers.  He does not -- he's never said that

19   he didn't say that.

20        THE COURT:  All right.

21        MR. VAN DYKE:  But he's said from the

22   beginning of my involvement with him he didn't recall

23   doing that, he had no intention of doing that going in,

24   whether it's adrenaline or whatever.

25        MS. MCELWEE:  Well, you have my evidence that

1    it was done.  And obviously, the tellers would talk

2    about that, Judge.

3              THE COURT:  Right.

4              MS. MCELWEE:  With regard to obstruction, we

5    ask the Court to rely on the letters which are in

6    Government's Exhibit 2 which reflect, as Ms. Hodgdon

7    alleges, the defendant wrote to Ms. Miller, essentially

8    providing her a script of what to say if called to

9    testify in court, but more importantly, with regard to

10   strategy and how to handle their cases.

11        He instructed her to, quote, get a psych eval,

12   drug rehab, get fucking pregnant, something, just stall

13   in order to provide additional time for their cases to

14   be severed.  Under those circumstances, it's quite

15   clear the defendant obstructed justice and the

16   enhancement should apply.

17        Lastly is the question of whether the defendant

18   should get acceptance.  There is absolutely no doubt

19   that Mr. D'Angelo pled guilty in this court, accepted

20   responsibility in that respect, saved the Government

21   trial.  However, the guidelines, under 3E1.1's

22   comments, indicate that voluntary termination or

23   withdrawal from criminal conduct and association is

24   indicative of acceptance.  And again, as Ms. Hodgdon

25   outlines very carefully, the defendant has failed to do

1    so.

2         I appreciate that the defendant is arguing that

3    since his plea, that slowed down and there's no

4    question it has.  There's absolutely far less evidence

5    that he's continued to behave.

6         However, he pled guilty in February of 2014 and

7    then we have the incident in March, which the Court is

8    well-aware of, which resulted in him having sexual

9    relations with another inmate, which was a significant

10   disruption at the Cumberland County Jail, and then

11   involved him being sent to the Maine State Prison as a

12   result.

13        I haven't received any information from the Maine

14   State Prison, but the list that you have in

15   Government's Exhibit 3 of his conduct, most significant

16   of which, I would argue, is his threat to a

17   correction's officer, and in particular, it's

18   highlighted here in Paragraph 5, that on November 10,

19   2013, Mr. D'Angelo informed a corrections officer that

20   he was facing 20 years federal time.  If I receive --

21   this is a quote -- if I receive 20 years, as soon as I

22   return to this jail and my handcuffs are removed, I'm

23   going to break the jaw of the closest intake officer.

24        That, coupled with his consensual sexual episodes,

25   and all of the -- making wine under his bed and

continuing to give the jail and the officers there a

hard time for months and months I do not think reflects

someone who has accepted responsibility and for those

reasons, as well as the obstruction, the letters, I

would ask the Court to not impose an acceptance of

responsibility.  Thank you.

THE COURT:  Thank you, Ms. McElwee.  Mr. Van

Dyke.

MR. VAN DYKE:  Your Honor, I will address -- I

know the Court has reviewed both my memorandum in

regard to sentencing and the supplemental memorandum

that dealt specifically with the issue of obstruction

and the interplay between 3C1.1 and 3E1.1.

Let me point something out to the Court which I

think the Court is aware of from our conversation in

the chambers conference.

There are three reported bases for the Court's

suggestion that a 3E1.1 credit be denied and they are

the failure of recollection with regard to the threat,

the letters upon which they predicate obstruction, and

the disciplinary issues at the jail.

If acceptance of responsibility means anything in

a rational world, it means that prior to that date,

someone is doing bad things and after that date,

they're not doing bad things, okay?  Otherwise, it

1    means nothing and the 1st Circuit's very clear, as it

2    should be, that you can have both obstruction and

3    acceptance because you can do a lot of bad things to

4    try and stand your defenses and spin a web and then try

5    to avoid responsibility and then one day wake up and

6    say I don't want to do this anymore, I want to plead

7    guilty.

8         Mr. D'Angelo pled guilty on the day of the hearing

9    on a very viable suppression hearing, the Court may

10   recall, well researched, well thought through.  We took

11   the time to go to the jail -- to the police department,

12   down to York County and listened to these tapes

13   involving -- the cell phone communications that led to

14   the identification of Mr. D'Angelo, and yet that day,

15   rather than standing and have a hearing, he told this

16   Court you know what, I did this.

17        He wrote a letter to Ms. Hodgdon, very clearly

18   articulating that he did this and why he did this.  It

19   was fueled by drug problems and all kinds of personal

20   dysfunction, and everything he did before that, he did

21   before that.

22        Yes, he sent letters to Jenna talking about

23   spinning a web of lies to make their case more viable;

24   he did that.  That's before he decided to man up.  He

25   manned up.

1      Since that time, and Your Honor can look at the

2  exhibits, every discipline in writing preceded the

3  plea.  The only write-up, the only incident we have was

4  the sex issue.  That was not written up.  I think it

5  was sort of embarrassing at the jail.  If this were a

6  fraternity house, it would be treated differently.  In

7  fact, that's the only incident of Mike D'Angelo being

8  less than a model person since that change of plea, and

9  this had been four months that he's been crime free,

10  juxtaposing to a lifetime before that of incident after

11  incident after incident.

12      This is actually a man who can actually credibly

13  stand before this Court and say I've changed and if

14  3E1.1 means anything, it means you don't hold him to

15  what -- before he makes his acknowledgement.

16      I think the Court should -- I'm not going to

17  contest the obstruction.  I do think the Government has

18  the better argument that those letters constitute

19  obstruction.  I have to be credible about that, but I

20  think the Court should give me knowledge of that

21  because otherwise, why does someone change their

22  stripes in they don't get credit for it.

23          THE COURT:  Thank you, Mr. Van Dyke.  All

24  right, Mr. Van Dyke, your argument has some rational

25  basis and I understand it and I hear it.

1    Unfortunately, I don't think the guidelines, if we're

2    doing an honest analysis under the guidelines, really

3    allow it and I'm going to try to explain why.

4         First of all, let me make clear that I'm not

5    considering the fact that Mr. D'Angelo corrected the

6    prosecution version by saying he didn't remember making

7    that threat.  I think that -- I credit that.  I think

8    he made that threat, but I understand, based on

9    adrenaline and things like that, but also how the

10   record is very clear that Mr. D'Angelo has had numerous

11   brain injuries, that it's possible that he did forget

12   it and it's possible that he told Jennica Miller about

13   it.  In fact, he probably did and then forgot it, so

14   I'm not holding that against him.

15        But I have to look at the other two areas that the

16   probation office has rested this on.  Let's look at the

17   screwdriver.  First, on the possession of the

18   screwdriver, that would be considered relevant conduct

19   to the offense, and I think that the Government has

20   proved by a preponderance that there are -- that he did

21   have a screwdriver.

22        I credit Miller's testimony there only because I

23   have the corroborating fact that there's a screwdriver

24   at the side of the road.  I think otherwise, this would

25   have been a he said/she said.  This just tips it the

1    other way and it's a preponderance, so we're talking

2    about 51 percent probability.  So there's that.

3        Then there's the letters that he wrote.  I

4    understand that he wrote those before his conversion,

5    but if you look at 3C1.1, obstructive conduct that

6    occurred prior to the start of the investigation of the

7    instant offense of conviction may be covered by the

8    guidelines.

9        This is well beyond that and I believe that the

10   letters themselves are very clear evidence that Mr.

11   D'Angelo was attempting to get Ms. Miller to spin a

12   story that would get her out of trouble and trying to

13   juxtaposition their cases so that they would both get

14   off, so I am going to find that obstruction applies.

15       And then I also am going to deny acceptance of

16   responsibility because under these guidelines,

17   acceptance of responsibility is -- should not be given

18   if somebody does not admit relevant conduct and I'm

19   finding the screwdriver was there so that -- that's

20   that on that.

21       Also, conduct resulting in an enhancement for

22   obstruction is -- ordinarily indicates that acceptance

23   of responsibility should not be given, only in

24   extraordinary cases where that is not to be the case,

25   and I don't consider this an extraordinary case and

1    then there's the issue of the voluntary termination or

2    withdrawal from criminal conduct, and he voluntarily

3    maybe withdrew after his conversion, except for the

4    instance with the woman in the jail where he jimmied

5    two doors at the jail and got her into the cell.  I

6    mean that's not good and, frankly, under any honest

7    application of the guidelines, I'm going to have to

8    impose obstruction and not give acceptance of

9    responsibility.

10         Now, having said that, I do acknowledge that the

11   defendant did come in here and plead guilty, gave up a

12   suppression motion.  He gave -- he did not put the

13   Government to its proof at trial, he did not force the

14   tellers at this bank to sit in the witness chair and be

15   put under cross-examination, he did not force the

16   cooperating defendant to come in and testify and I do

17   think that he should get some credit for that.

18   Generally, that's considered acceptance of

19   responsibility.  I'm not going to give that.

20         I am going to consider that in the variance part

21   and I'm not exactly sure what I'm going to do as far as

22   how I'm going to vary yet, but I think it's an

23   appropriate thing to consider, especially given his

24   mental health issues and his brain trauma.

25         I think what we're seeing in this ridiculous

1   litany of offenses at the jail are somebody whose just

2   had a lifetime of problems relating to mental health

3   issues and probably brain injury.  So those are my

4   rulings.

5        Now, I don't know if there are any witnesses for

6   the defendant.  Let me start there.

7             MR. VAN DYKE:  There are no witnesses.  We

8   have people who would address the Court, but no formal

9   witnesses to the stand.

10             THE COURT:  Okay.  And Ms. McElwee, you have

11   tellers who would like to speak?

12             MS. MCELWEE:  I have four bank employees who

13   want to speak, Judge.  Are we going to do that before

14   or after the guideline analysis?

15             THE COURT:  I generally do victims first and

16   also people to speak on behalf of the defendant and

17   then I'll give the allocution right and then move to

18   guideline calculation.

19             MS. MCELWEE:  Okay.

20             THE COURT:  So I think we can start with the

21   victims.  That might be -- and then move to the defense

22   witness.

23             MS. MCELWEE:  Okay.

24             DENISE:  My name is Denise.

25             THE COURT:  Can you just give me one minute

1   here.  Go right ahead.

2          DENISE:  Good morning, Your Honor.  Thank you

3   for hearing us today.  I will be brief.  I have very

4   succinct thoughts.

5          This one minute or so crime of robbing Kennebunk

6   Savings at our Berwick branch has really left us with

7   lifelong effects.  I'm not speaking for my team; I'm

8   speaking for myself, but I feel like I'm forever

9   changed.  I'm so not the person I used to be.

10         I'm now distrusting; I'm hyperalert.  When I have

11  a customer in any of the branches that I'm in where

12  they are loud or there's fast movement, I jump into

13  alert mode.  I am angry.  This criminal stole more than

14  money from a faceless bank.  He stole the feelings of

15  safety in the workplace.

16         We're a public institution.  We cannot close our

17  doors because a bad guy did what he did.  We're open

18  every day and the thought that this could happen again

19  is ever present now.

20         He stole my ability to sleep peacefully at night

21  and his actions stole from my family because my husband

22  now doesn't sleep at night and has to make me feel

23  better when I have a nightmare.

24         I feel also helpless and very guilty.  I couldn't

25  protect my team.  I was in the office -- I'm the

1    assistant manager.  I felt like I, once the crime

2    happened and police came in, had to put on a strong

3    game face in the aftermath of the robbery and

4    thereafter every day at work.  So I put on my work face

5    and went in and was strong for the team and then I

6    would go home and my husband would have to sort of put

7    me back together.

8        So all that being said, I hope that you put this

9    criminal away for a very long time so that he does not

10   do this to another person.  Thank you for listening.

11       THE COURT:  Thank you.  Good morning.  If you

12   would state your first name.

13       SARAH:  Sarah.  I was a teller at the

14   Kennebunk Savings Bank office in Berwick on

15   September 21st, 2012.  I did see Michel come into the

16   office.

17       THE COURT:  You're going to have to slow down

18   because this is all being taken down and no court

19   reporter can keep up with that speed.

20       SARAH:  I did see Michel come into the office

21   dressed as a woman, but heard his voice shouting at one

22   of my co-workers and quickly realized that he was

23   robbing her.  The feeling that came over me to protect

24   her, to tell him to stop yelling at her, the guilt I

25   had standing there knowing I couldn't do anything and I

1   had to let it happen.  The anger that you can walk into

2   our workplace, a comfortable, safe place and threaten

3   our lives.

4        The impact this robbery had on us initially was

5   fear, the what ifs and who was it.  The fear was not

6   only sensed by myself, but my husband asked whether or

7   not I should even continue to work in a bank.  My

8   children would overhear things and have questions and

9   worries.

10        I couldn't believe that this was really happening,

11   but after Michel was caught and we found out that he

12   was a career criminal, I felt thankful, thankful that

13   nothing more than a bank robbery happened.  More fear

14   because he's a serious bad guy, fear that these people

15   are roaming around my small hometown.

16        The impact this robbery still has on me a year and

17   a half later, I still get nervous and anxious in high

18   stress situations at the bank and in my personal life.

19   Any time someone comes running into the building, my

20   heart starts to race wondering if this is it.  If a

21   customer is confrontational, my anxiety about the

22   situation is higher than it would have been before the

23   robbery.

24        Part of me is not prepared.  You have changed my

25   if it ever happens into when it happens.  When I began

1   working in banking, it never once crossed my mind that

2   I could be robbed any day and every day going to work.

3   Even though I don't wake up every day thinking today

4   could be the day it happens, I'm more aware this very

5   well could happen.  Thank you.

6            THE COURT:  Thank you.

7            CHELSEA:  My name is Chelsea.  I was the

8   victim teller at the bank that day.  Everything is

9   starting to go almost normal again, now that I'm

10  working at a new location, that is until I was asked to

11  relive the situation and write a statement.  I tried so

12  hard to just forget about that day.  It's a lot harder

13  than you would think.

14       I remember being a complete wreck every time I

15  received a letter in the mail seeing that the court

16  date had been pushed back.  I just want it to be over

17  with.  I eventually just stopped even opening the

18  envelopes.

19       I remember watching him come through the door

20  almost in a run right at me.  All I wanted to do was

21  turn around and run away, but of course I knew that

22  wasn't an option.  Shaking and barely breathing, I got

23  him out of there as quickly as I could.  I was in such

24  shock that I couldn't move; never mind trying to dial

25  the simplest numbers 9-1-1.

1        Also immediately, I had so many different emotions

2   going through me; why me, there are four tellers

3   working that day.  If he had come an hour later, maybe

4   I would have been at lunch and it could have been

5   someone else, but then again, nobody deserves to be

6   treated like that.

7        Going back to work that following Monday had to be

8   one of the hardest things I've done.  Week after week,

9   I had to force myself up in the morning to go to work

10  where I used to love going in seeing my work family and

11  awesome customers.

12       Now, every time someone talks through the door

13  just a little too quickly, or raises their voice

14  because something isn't going their way, or even if

15  someone who seems a little on edge makes my heart feel

16  like it's beating out of my chest and I just want to

17  cry.

18       For weeks, we had to deal with customers coming in

19  and asking what happened that Friday and all we could

20  tell them was that we can't talk about it, but assure

21  them we're all fine, which physically we were, but

22  emotionally, this is going to affect us the rest of

23  ours lives.

24       It makes me angry to think I can let somebody

25  affect me so much.  I can't go to work without being on

```
 1     edge.  I question every person who is unfamiliar to me.
 2     I can't even go into another bank without constantly
 3     looking around me.
 4          I feel foolish for getting so emotional over
 5     something that happened in less than a minute, even
 6     though it felt like forever.  I'm ready for the
 7     nightmares and confused emotions to be over.  That's
 8     it.  Thank you.
 9               THE COURT:  Thank you.
10               VICKI:  Good morning, Your Honor.
11               THE COURT:  Good morning.
12               VICKIE:  I'm Vickie.  I was on the teller line
13     that day.  Being older than the other tellers, I have
14     always felt very motherly towards them.  When he walked
15     in the bank that day, I knew when I saw him what he was
16     going to do.  I felt helpless to stop it, but to
17     protect the teller he was heading towards.
18          I had watched him and I kept thinking hurry up,
19     hurry, hurry.  He was very agitated and it made me
20     anxious because I didn't know what he was going to do
21     next.  I just wanted him to stop and leave.
22          Since this happened, if someone walks into the
23     bank and looks a little different or rushes to the
24     teller line, my heart starts racing.  It doesn't take
25     much to trigger memories.  I have sleepless nights
```

1    where I relive the events of that day.

2        Emotionally, this affected all of us so I would

3    like to see him get the maximum sentence for this

4    crime.  Thank you.

5            THE COURT:  Thank you.

6            MS. MCELWEE:  That's all we have, Judge.

7    Thank you.

8            THE COURT:  All right.  Thank you, Ms.

9    McElwee.  Mr. Van Dyke.

10           MR. VAN DYKE:  Yes, Your Honor.  We have two

11   individuals who would like to address the Court.  John

12   Lockner (sic).

13           THE COURT:  All right.

14           MR. VAN DYKE:  I'm sorry, Loughran.

15           MR. LOUGHRAN:  Good morning.

16           THE COURT:  Good morning.  Would you state

17   your full name for the record.

18           MR. LOUGHRAN:  It's John Robert Loughran.

19           THE COURT:  And would you spell the last name.

20           MR. LOUGHRAN:  L-o-u-g-h-r-a-n.

21           THE COURT:  All right.  Go ahead, Mr.

22   Loughran.

23           MR. LOUGHRAN:  Your Honor, I'm not -- I don't

24   have anything prepared for this morning, but I'm not

25   trying to negate the feelings of these good people that

1   are in here, but everybody in life has a ying and yang,

2   a good and a bad.

3       And I've known Michel for -- since he was probably

4   15 and I think -- if I can just give you two incidents.

5   I had severe heart problems and my wife also had a

6   problem where she's just gone through her 43rd surgery.

7   She's got necrotizing fascitis.  If you know, that's a

8   flesh eating disease.

9           THE COURT:  Um-hmm.

10          MR. LOUGHRAN:  And out of all our so-called

11  friends, who I won't say abandoned us, but made

12  themselves very scarce, and a person that wasn't even

13  part of my generation, we had Michel come by any time

14  he was in town, offer us help, money, anything he could

15  do, work.

16      There is a part of Michel that -- I mean everybody

17  has this idea he's just a career criminal and a

18  gang-banger, whatever, but it's part of him -- I have

19  two sons that I feel as much love towards Michel as I

20  would my sons and that's because of how he's treated me

21  over the years and how he's treated others.

22      I would just -- would like to say that there's a

23  whole different Michel that I know that these other

24  people don't.  And he's intelligent, he's giving and I

25  feel myself it would be a terrible, terrible waste of a

1    very potentially good person if he would be put away

2    for any serious time, I guess.

3        And like I say, it's -- my experiences with him

4    have been good.  I've never had a problem with him and

5    as far as -- I guess, Michel lives by his own rules.

6    But I'm a commercial fisherman and I make money in --

7    you know, it's either feast or famine and one of my

8    feasting times, I made $20,000 or something and the

9    wife -- I had to take my wife down to Portland to a

10   doctor's appointment and I had forgotten like $14,000

11   on my kitchen table.

12       And I told Michel -- and I didn't see him in

13   months -- that any time he needed a place to flop, he

14   was welcome to come in.  Anybody is in my house.  I

15   don't have a lock on the door.  But if you needed a

16   place to stay, you can come and stay and him and his

17   girlfriend, Jenny I think her name -- I don't know her

18   last name -- unbeknownst to me came in that morning.

19       And we had left around 8:00, he came in some time

20   after that, stayed all day and several weeks later, I

21   found out Michel -- when I saw Mike again that he had

22   stayed that day and that $14,000 was still on the

23   kitchen table.

24       And like I say, he's -- to me he's a totally

25   different person than is being described today.  Again,

```
 1   I just say it would be -- he's got good potential.
 2   He's a -- not a good man, but he has the potential to
 3   be one.
 4              THE COURT:  All right.  Thank you, Mr.
 5   Loughran.
 6              MR. LOUGHRAN:  You're welcome.
 7              MR. VAN DYKE:  Wanda Hazen, Mr. D'Angelo's
 8   mother.
 9              MS. HAZEN:  Good morning.
10              THE COURT:  Good morning.  Would you state
11   your full name and spell it for us, please.
12              MS. HAZEN:  Wanda, W-a-n-d-a, Hazen,
13   H-a-z-e-n.
14              THE COURT:  Thank you.  Good morning, Ms.
15   Hazen.
16              MS. HAZEN:  Good morning.  I am Michel's mom
17   and as you're aware of the fact that Michel had
18   sustained some serious head traumas over the years and
19   we've tried varying courses of treatment for him.
20       When he's good, he's really good.  He is one of
21   the most wonderful, loving people you've ever known.
22   You add in the mix that just clashes around when people
23   try to do what they can do to balance themselves.
24       The side of him that I see, that I know is always
25   giving.  He's always helping his grandparents, he helps
```

1     his aunts, he helps me.  This is -- for me was so out

2     of character to even think that he had done something

3     like this.  I just -- I was in shock.  He's such a

4     wonderful person.

5          I don't have issues with him.  Like I said, he's

6     been extremely helpful and I'm terribly sorry for, you

7     know, the pain and suffering that these other people

8     are going through, but I do too.

9          This has not been an easy road.  My son has so

10    much of a potential.  If that first injury had not

11    happened to him, he would probably be very different

12    than he is now.  And I think another bout of extended

13    incarceration, after the abuse that he sustained prior,

14    would do all of us a disservice.

15         He has potential for so much more than what

16    everyone is seeing and saying now.  I love my son and I

17    accept him for good or bad.

18              THE COURT:  Thank you.

19              MS. HAZEN:  Thank you.

20              MR. VAN DYKE:  Your Honor, Crystal Marvin, who

21    is the mother of Michel's son, Devon, contacted me and

22    spoke with me -- spoke to me at length, was going to

23    send a letter and I never -- and I had not received it

24    and it may be the shortness of time I haven't received

25    it yet.

1          I don't know if the letter is here in court.  I
2    can tell you what she told me, if that's acceptable to
3    the Court.
4              THE COURT:  Any objection?
5              MS. MCELWEE:  I told him I wouldn't object to
6    that.
7              THE COURT:  All right, go ahead.
8              MR. VAN DYKE:  According to Crystal, Michel
9    has regular contact with his son Devon, who resides
10   with her parents, and she tells a very similar story to
11   what Mr. Loughran and Wanda said.  Someone who's
12   basically very loyal and almost tribal to the people
13   who he's close to.
14         And then he has an ability, apparently, to -- like
15   an on/off switch, the way she described it, that he'd
16   be not so much when things go averse.  And it struck me
17   as almost an impulse control issue that was discussed
18   in the medical records and an inability to deal with
19   bad events and bad circumstances.  But outside of that,
20   intelligent, loving, almost tribal and that's the way
21   she described him.
22         She has no problem with him having contact with
23   the son who has a relation with the father and only had
24   good things to say when that Mike is in the room.
25   That's what she said.

1           THE COURT:  All right.  Thank you.  Mr.

2     D'Angelo -- oh, I think I'll do my recommendations

3     first.  I'll hear the recommendation from the

4     Government.  Do you want me to do guidelines before

5     that --

6           MS. MCELWEE:  If you wouldn't mind, Your

7     Honor.

8           THE COURT:  -- so you know where I stand?  All

9     right.  Let's look at the guidelines.  All right, under

10    2B3.1 of the guidelines, the bank robbery Count 1

11    offense starts at 20.  There is a two point enhancement

12    for taking the property of a bank.  A three point

13    enhancement for use of a dangerous weapon during the

14    offense during the offense.  A two point enhancement

15    for the role in the offense relating to directing

16    Miller to place the two 911 calls to create a

17    diversion.  And there's a two point enhancement for

18    obstruction of justice.

19          That leaves us with an adjusted offense level of

20    29.  There is a Chapter 4 enhancement in this case

21    because the defendant qualified as a career offender,

22    which would have us use an offense level of 32 since

23    it's higher than the 29.  No points are awarded for

24    acceptance of responsibility so we're at a total

25    offense level of 32.

1          The defendant scored 10 criminal history points,

2     which put him in a Category V, but because he's a

3     career offender, we use Category VI, which means that

4     the defendant is offense level 32, Category VI.

5          The guideline range is 210 to 262 months.  The

6     guidelines are capped at 240 months because there's a

7     20-year maximum on this offense so the guideline range

8     is 210 to 240 months.

9          Other than the objections already stated by

10    counsel, are there any objections to those

11    calculations?

12              MS. MCELWEE:  None, Your Honor.

13              MR. VAN DYKE:  None other than those raised.

14              THE COURT:  All right.  Ms. McElwee, do you

15    want to make a recommendation?

16              MS. MCELWEE:  I do, Judge, thank you.  As the

17    Court is aware, although I'd like to state on the

18    record, you will as well, but because I want to

19    organize my recommendation, I'll focus on the 3553(a)

20    factors and how they relate to the guideline range of

21    210 to 240 months.  Obviously, the Government is going

22    to ask for the 240 months and the maximum term of

23    supervised release.

24         The most important factors under 3553(a), I think,

25    that call for that sentence, most importantly by

1    itself, is the need to protect the public from further

2    crimes of Michel D'Angelo.

3        Mr. D'Angelo is 34 years old and he started

4    victimizing other people in this community when he was

5    19.  That continued until his most recent arrest in

6    this case, in September of 2012 and --

7           (Discussion off the record between counsel).

8           -- he's 35 right now, thank you.  And as a

9    result, he's a career offender.  At the age of 22, he

10    first stole someone -- at the age of 19, I'm sorry, he

11    stole from someone.  At the age of 22, he had his first

12    domestic assault conviction when he punched his

13    girlfriend in the face.  That same year, he terrorized

14    some people, he burglarized a person's home and he

15    criminally threatened them.

16        At the age of 27, he again committed another

17    assault, which was dropped down from an aggravated

18    assault to a misdemeanor assault.  At the age of 28, he

19    assaulted a corrections officer.

20        At the age of 31, he stabbed somebody and when the

21    police stopped him and his then girlfriend Jennica

22    Miller, who is the co-defendant in this case, she

23    claimed that -- she whispered to the police what would

24    happen, that he would kill her.

25        Mr. D'Angelo's friend described him as a good

1    person and his mother did too and that's not

2    surprising.  Ms. Miller described him that way at

3    times.  It's clear that Mr. D'Angelo is capable of

4    being loving to his family and his friends.  But Mr.

5    D'Angelo has absolutely no regard for strangers and

6    people who share this planet with him.

7         He is drug addicted.  Perhaps he comes by that

8    completely justifiably because his brain injuries are

9    severe.  Like many defendants that you see, Judge, what

10   makes him sympathetic also makes him incredibly

11   dangerous because he has shown up with this history,

12   described to you by the witnesses alone today, that he

13   is capable of turning it on and off or that it comes on

14   and off to him.  And whether it's impulse control or a

15   brain injury -- I mean we're talking about someone

16   who's sober in jail -- sober if he's not using the wine

17   under his bed -- but sober in terms of what was

18   happening on the street when he was heroin addicted and

19   he's threatening a corrections officer I'm going to

20   punch you in the face.

21        So it isn't just about drugs.  It isn't just about

22   being high and out of control, and he's had years and

23   years of services and options to put it in a right path

24   because these people describe he has potential, and I

25   don't dispute that at all, I don't.  I've dealt with

1     Michel, I've seen cases involving Michel before this

2     and he does have potential.  I've heard witnesses

3     describe him as being intelligent, and I have no reason

4     to doubt that.  I've had lawyers describe him that way.

5         But I want on this record -- and I apologize

6     because the Court's heard it before -- I want on this

7     record the following language from the sentencing memo

8     filed by the defendant -- co-defendant, Ms. Miller.

9         For the first six months they were together,

10    Michel was extremely nice to Jennica.  They had fun and

11    he treated her well.  After about six months, he began

12    to get crazy jealous and got mad at her for talking to

13    anyone besides him.  At that point she broke up with

14    him and moved back to her mom's.  She was there for a

15    while and hung out with old friends and partied.

16        Fairly soon after she moved to her mother's,

17    Michel moved to the area.  He came to Jennica's house

18    and he asked her to get back together with him.  She

19    got into his car to talk with him.  He then told her

20    she was going to go back with him and that if she

21    refused, he would hurt her family.  He specifically

22    threatened her little brother, with whom she is

23    incredibly close, and she believed his threats.

24        According to Jennica, Michel became a completely

25    different person.  He would not let her talk to anyone.

1   The only person she was allowed contact with was her

2   mother and he listened in on her conversations.  She

3   was not allowed to go anywhere by herself.  He

4   continuously told her that he would hurt her family if

5   she left him.

6        Soon after she went to Michel, she missed her

7   period.  When she found she was pregnant with another

8   man's child, he angrily raped her and beat her.  He hit

9   her until her head became swollen and bruised.  He

10  choked her until she passed out.  Once her bruises

11  healed, he forced her to get an abortion.  Jennica was

12  19.

13       She was with Michel for the next two years and

14  during that time, he was consistently violent with her.

15  Any questioning of his activities resulted in abuse.

16  If he felt she was going against him or she disagreed

17  with something, there were consequences.  He got very

18  easily jealous and this too would result in abuse.

19       The abuse was fairly constant and involved her

20  being grabbed by her hair and having her head smashed

21  into the ground, being thrown across the room, being

22  hit and, quite frequently, being choked out multiple

23  times.  At one point, he broke several of her ribs.

24       This is from Document 113 in the same docket

25  number 2:13-cr-114.

1      This defendant, if the Court considers the history

2  and characteristics, the need for just punishment,

3  specific and general deterrence, calls for this Court

4  to impose a sentence as long as possible.

5      With all due respect to his mother, who must find

6  this incredibly difficult given the boy she knows, this

7  was not out of character for him.  He has had a

8  lifetime of abusing and threatening other people and he

9  may have potential, but if we blame what he did in that

10  bank that day on his mental health and his brain

11  injury, then we put him back out on the street to

12  continue to victimize more people and it's just not

13  something that this Court can let happen.

14      And for those reasons, under those particular

15  factors, I ask the Court to impose 240 months.  Thank

16  you.

17          THE COURT:  Thank you, Ms. McElwee.  Mr. Van

18  Dyke.

19          MR. VAN DYKE:  Your Honor has clearly reviewed

20  the motion for variant sentence and the accompanying

21  memorandum and it laid out to the Court, I think, a

22  fairly objective discussion because this doesn't come

23  from Dave Van Dyke, this came from records that the

24  probation officer reviewed, and it was co-extensive

25  with what Ms. Hodgdon said in the sentencing report

1    regarding this history with regard to Mr. D'Angelo.

2        And before I get to why -- tell the Court what my

3    recommendation is, walking in today, I thought it more

4    likely than not the Court would grant acknowledgement

5    given what I view to be the Mike D'Angelo that the

6    Court sees today as opposed to pre-plea conduct, but

7    the Court has declined that invitation.

8        I was going to suggest that if we're talking about

9    the 29 points criminal level six, and if you go to the

10   approximately 151-month range and you take ten percent

11   off for the circumstances that led him to where he is,

12   the variant factors, you would arrive at approximately

13   12 years.

14       Although the Court did not grant, acknowledge,

15   give credit to 3E1.1, the Court did say that there were

16   certain factors that should be considered in the more

17   Gestalt sentencing analysis, if not in 3E1.1, and I

18   would suggest the appropriate place to do that is in

19   the variant side of this.

20       If we're talking about a base of 210 months to

21   240, that we have to vary somewhat more than the ten

22   percent I was proposing because instead of considering

23   these facts in the context of an acknowledgement

24   credit, the Court will be considering these factors in

25   the context of its review of the amount to vary here.

1      The point is that we have an individual who is

2   born with certain DNA that suggests high performance,

3   high intelligence, and it all goes sideways at a very

4   young age when he suffers an injury, and I don't know

5   what he was doing that day to cause an injury, maybe a

6   four-year old just falls, but the fact is he's a

7   four-year old, he falls, he destroys his inner brain

8   and loses all impulse control.  And that is sort of the

9   point where everything changes because where this goes

10  is not where it could have gone.

11      And what do you do with somebody who lacks -- you

12  know, whose main spring is broken because of something

13  that -- a physical problem and manifests itself in a

14  lifetime punctuated by crime, a lifetime of failed

15  institutional placements, medical placements,

16  institutional placements.

17      He's 35 years old today, not 34, and it's

18  important for purposes, I understand it, of the way BOP

19  treats people who are 35 is different from 34, and I

20  want to make sure the Court is aware that his 35th

21  birthday occurred between the initial interview and

22  today.

23      But when he's out, he's going to be late 40s and a

24  person in their late 40s is very different from a

25  person in their mid 30s.  You have less energy, you

1    have less ability to be defiant and at some point, you

2    get out of jail and the Court can either have it be in

3    his late 40s or in his mid 50s.

4         So I want to suggest what the Court do is give

5    some consideration to how he got to where he is and

6    give him the option to make something of his life and

7    put that onus on him.  That, you know, I'm giving you a

8    break in recognition to what happened to you that

9    brought you where you are today.  And the choice is

10   yours; at age 47 or 48 to make what's left of your life

11   productive with the gifts you do have.

12        Warehousing at some point is not a social good.

13   You know, if someone gets every opportunity in life and

14   makes choice after choice after choice and brings

15   themselves to where they are, then, quite frankly, they

16   don't deserve that consideration.  But here's a person

17   at age four suffers a closed head injury and his life

18   since that time is punctuated by events directly

19   related back to the fact that the brain just simply

20   doesn't work.

21        In light of the Court's finding of 3E1.1, which I

22   respect, I would ask the Court to vary about

23   30 percent, about a third, because the fact is that

24   unlike a lot of people who you're going to see, who you

25   have seen, he's brought here by circumstances beyond

1    his control.

2        I don't know what I'd be today if I had no rage

3    control.  I'd be sitting next to him.  I ask the Court

4    for 144 months, 12 years.  Thank you.

5            THE COURT:  Mr. D'Angelo, as the defendant

6    before the Court for the imposition of sentence, you

7    have a constitutional right to address me.  Is there

8    anything you'd like to say?

9            THE DEFENDANT:  Yes, Your Honor.  I would like

10   to say a few things.  First being I agree with

11   everybody, you know, in regards to I deserve, you know,

12   to go away for quite a while, you know.  I've done some

13   bad things; I can't take them back, I wish I could,

14   it's just not possible.

15       Some of the things that were alleged though I just

16   can't go on without, you know, contesting them in

17   regards to, you know, like I'd be perfectly willing to

18   take a polygraph test or anything in that proffer

19   against me, you know, for the incidents alleged.

20       A lot of things in there ain't true.  As far as

21   sexual assault, absolutely not.  I can't -- it's

22   something that disgusts me.  I can't stand it, but my

23   prior violence in prison, you see in the PSI, was

24   against child molesters and sex offenders.  That's just

25   not me.

1          With regards to threatening her little brother, I

2     love that kid just like he's my own little brother.  I

3     would swing, play football and try to wrestle.  We had

4     some fights that were physical, absolutely.  I don't

5     deny that.  I have problem with anger more often than

6     not, and I had to deal with that.

7          Now, in regards to, you know, acceptance, you

8     know, when I -- the day that I withdrew my -- you know,

9     my suppression motion and decided to go forward and

10    plead guilty, you know, I had -- you know, nothing was

11    offered to me.  I just did that, you know, I need to

12    accept responsibility and at that time, the prosecutor

13    came over to the table and wrote down on paper what I

14    could expect by pleading guilty, which was 151 to 188,

15    and if I was to go to trial, I would expect to be 210

16    to 240.

17         Now, from that day she kept going to my lawyer

18    asking me to proffer, she wanted me to proffer, she

19    wanted me to proffer.  I refused to proffer and, you

20    know, she almost like strong-arm tactic to try to get

21    me to proffer saying, you know, I'm going to promise

22    you won't get any new, you know, prosecution and

23    indictments whatnot.

24         And from the time that my lawyer relayed that I'm

25    not proffering, then comes these -- the letters that

1    they use for the obstruction.  I don't deny that.  But

2    it seemed like it was something, you know, geared

3    towards they were upset that I wouldn't proffer.

4         After I pled guilty, she again asked my lawyer to

5    have the proffer.  I refused then and now the proffer

6    agreement from Jennica comes out in the PSI, you know,

7    and in the beginning when I was going -- when I decided

8    I wanted to plead guilty, she is writing on a piece of

9    paper I should expect 151 to 188.

10        You know, and I believe that's a lot of the

11   Government's position in regards to try to give me such

12   a strong sentence and I believe that proffering itself

13   is not taking responsibility for my actions, by pushing

14   it on someone else, on someone else's family and, you

15   know, to go through what I'm going through.  I don't

16   want my family to be in jeopardy and I just believe

17   that that had a lot to do with the Government's, you

18   know, take on trying to want me get such a large

19   sentence.

20        Like I say, in that proffer agreement and that

21   proffer agenda, there is a lot of fallacy, a lot of

22   untruths and I can't -- I don't know how to make you

23   believe me.  It's my -- you know, I don't want to sit

24   here and say he said she said because that's not what

25   it's about.  It's accepting responsibility for what

1    I've done.  I do that.

2         I robbed that bank, I was really high when I went

3    in that day, I was really high, you know.  I felt like

4    I was kind of outside my body and I just wasn't even

5    like caring like I am with you right now.  I wasn't

6    there then.  That's really all I have to say, Your

7    Honor.

8              THE COURT:  Thank you, Mr. D'Angelo.  Let me

9    make my record here.  I'm relying on the following

10   documents.

11        I received a written statement of the defendant

12   and I've reviewed that.  I've read the defendant's

13   sentencing memo and the supplemental memo relating to

14   the acceptance of responsibility.  I received two

15   victim impact statements from two of the tellers, one

16   of whom spoke today.  I heard the testimony of the four

17   victims who came before me.  I heard the arguments of

18   counsel and, of course, the allocution of the

19   defendant.

20        I didn't see a victim impact statement in the

21   record from the bank, but there was one in the Miller

22   sentencing.

23              MS. MCELWEE:  There was.

24              THE COURT:  And I did review that.  That sets

25   forth the restitution amount as well and so I've

```
1     considered that as well.

2               MS. MCELWEE:  Thank you, Judge.

3               THE COURT:  Does counsel wish to comment on

4     any of this material?

5               MS. MCELWEE:  On any of the materials -- no.

6               THE COURT:  That's just been -- that I just

7     described or what I'm relying on for sentencing.  Any

8     further comment?

9               MR. VAN DYKE:  Just for the record, you also

10    heard Ms. Hazen and Mr. Loughran.

11              THE COURT:  Yes, I'm sorry.  Thank you for

12    pointing that out.  I did hear the allocution, I guess

13    you'd call it, of Mr. Hazen (sic) and Mr. Loughran.

14    Sounds like a Scottish name, maybe.  And I also have

15    the Government's Exhibits 1, 2 and 3.  So that's the

16    body of the evidence in front of me.

17         All right, there's no plea agreement in this case.

18              MS. MCELWEE:  There is not.

19              THE COURT:  All right.  And I've carefully

20    considered all of what I've just mentioned and I just

21    want to explain to everybody really what my job is here

22    today.

23         My job is to impose a sentence -- under the law,

24    I'm required to impose a sentence that is sufficient,

25    but not greater than necessary to reflect the
```

1   seriousness of the offense, to promote respect for the

2   law, to provide just punishment for the offense, to

3   afford adequate deterrence, to protect the public and

4   to provide the defendant with educational and

5   vocational training, medical care or other correctional

6   treatment in the most effective manner.

7        In determining the sentence, the law requires me

8   to consider the nature and circumstances of this

9   particular offense, the defendant's history and

10  characteristics, the sentencing guidelines, the need to

11  avoid unwarranted sentencing disparities and the need

12  to provide restitution.

13       I have taken all of those factors into

14  consideration and I focus for now primarily on the

15  nature and circumstances of this offense and the

16  defendant's history and characteristics.

17       First of all, Mr. D'Angelo, I think you may

18  understand, especially after hearing the victims, that

19  bank robbery is a very serious offense.  It's serious

20  for a number of reasons.  It's serious because it

21  causes the victims, as you heard, to endure absolute

22  terror which actually lasts a long, long time.  For

23  some people, it lasts the rest of their lives.

24       You heard one of the tellers say that it's changed

25  her forever.  She no longer can feel relaxed at work.

1    She's always at stress when something is a little off

2    or some customer comes in and looks a little strange.

3    It's like they're are all waiting for the other shoe to

4    drop and it's all stress on them.  Stress is not good

5    in anybody's life and it can cause health problems.

6    You heard the teller talk about her heart starts racing

7    whenever she sees something a little off now.

8         And you also heard the victim teller who was

9    scared to death of you.  You turned the job that she

10   loves into a job she now dreads.  That's a long impact

11   that she's going to have to deal with.  This was a year

12   and a half ago, and some of these tellers are having a

13   hard time keeping it together just to tell me what

14   happened that day.

15        So there's a real lost sense of security that

16   people get when they are victims of this type of crime

17   and ruins their job for them.  They can't sleep, they

18   wake up in the middle of the night, it affects their

19   families, their children are worried because their

20   parents are changed, so it's very difficult for these

21   victims.

22        It's also a crime that puts not just the bank

23   tellers at risk, but the police, innocent bystanders.

24   Oftentimes, these crimes are interrupted and -- or in a

25   high speed chase and someone gets hurt.  So we're very

1    lucky here that we don't have that aspect of it.  But

2    it's what makes it a very serious crime and it's what

3    makes it have such a high penalty on it.

4         Now, I look at your history and characteristics

5    and I see from the presentence report that your life

6    took a turn for the worse when you were four years old.

7    You fell from a second story porch.  You fractured your

8    skull.  It was described, I think, as a double fracture

9    and you were sent -- after it was determined that you

10   had some motor control issues, you were sent to Mass

11   General and the result revealed that the impulse

12   control center of your brain, in the words of the

13   report, had been annihilated.

14        At the age of six, your father committed suicide.

15   Your mother remarried and your new stepfather abused

16   you.  So you had a very difficult start to life.

17        You started then to experience seizures, probably

18   related to the head trauma that you received, and those

19   dogged you for really the rest of your life.  It sounds

20   like there are some that have been fairly recent.  And

21   during some of these seizures, you fell and reinjured

22   your head.  So it's a terrible situation that you've

23   been put in because of a fall at the age of four.

24        And we see not just at the age of 19 you started

25   to act out, but you started to act out very young.  You

1    were assaulting other children, pushed a boy through

2    the window in the sixth grade, nearly broke your

3    sister's neck at one point, assaulted a two-year old

4    that your mother was babysitting, assaulted the vice

5    principal of your school.  There was talk about

6    throwing a bomb made of chlorine powder and Pepsi into

7    a group of kids to see what their reaction was.

8        And then you had some additional head trauma when

9    you struck -- in a car -- you were in a car and it

10   struck a tree at 80 miles-an-hour.  You were hit in the

11   head with a pipe in a fight, apparently, with other

12   kids.

13       You also started to use alcohol and drugs at a

14   very young age, I think it was nine the report said

15   that you started experimenting with alcohol and

16   marijuana.  It progressed to cocaine and then to

17   opiates with a lot of other drugs in-between that you

18   experimented with.

19       You managed to get through the 11th grade and

20   you've earned your GED, and your counsel tells me

21   you're an intelligent person and I think you must have

22   been because of all of the really disruptions in your

23   life caused by all of these different events related to

24   your discipline problems.  For you to get a GED -- to

25   get through the 11th grade and then get a GED was

1  pretty amazing.  I read your letters and you certainly

2  can write and express yourself, so you are an

3  intelligent person.

4       Your work history is very limited, very sporadic.

5  As a teen, you were in and out of juvenile facilities

6  and psychiatric facilities and you've been on a long

7  list of medications to treat various conditions that

8  you have.  You've had to deal with those seizures, your

9  bipolar disorder, ADHD, ADD, ODD, all of those with

10  different drugs and medications.  Layered on top of

11  that, you're abusing drugs.  It's a real perfect storm,

12  I guess I would say.

13       And then you became an adult and you started going

14  in and out of the criminal system and in and out of

15  various jails and the Maine State Prison.

16       Your criminal history is really longer than my

17  arm.  Operating without a license at 17, theft at 19,

18  operating without a license at 19, disorderly conduct

19  at 19, failure to appear at 20, assault on the mother

20  of your daughter at 22, an assault where you punched

21  her in the face, terrorizing at 22, burglary and

22  criminal threatening at 22 and in that burglary, shots

23  were fired and you actually were grazed by a bullet.

24  There were a number of problems that you had while you

25  were incarcerated on that.

1      Trafficking in prison contraband when you were 25,

2    assault when you were 27, refusing to sign a criminal

3    summons and failure to provide your name to police when

4    you were 28.  Felony assault on an officer at the jail

5    when you were 28 and assault, which was the stabbing

6    that was referred to when you were 31.  Threats to

7    Miller and other female witnesses if they ever

8    testified against you.  An uninsured motor vehicle and

9    giving police a false name again when you were 31.

10    Refusing to submit to arrest, operating after

11    suspension and failure to give your name at 31, and

12    those are just your convictions.

13      And then from those convictions, you score out at

14    a ten, which is your Category V, but you're a

15    Category VI because of your career offender status.

16    And in addition to those convictions, there's

17    additional criminal conduct and other arrests which

18    didn't result in conviction, which suggests to me that

19    your life from age 16 to today has just been one scrape

20    with the law after another, in and out of jail.

21      And there are currently pending in Knox County

22    charges, drug charges, an eluding an officer charge.

23    Again, I mentioned the long history of problems in

24    jail.  You've made numerous suicide attempts and you've

25    got a history of cutting to ease your stress.  I just

1    look at this and I think you must really be exhausted.

2    And through it all, your mother has stuck by you and

3    has loved you, which is really good for you.  I'm sure

4    there are mothers that would have given up.

5        And I'm going to -- what I'm going to do is you're

6    at a level 32 and a criminal history Category VI and I

7    try to balance what I can here given your -- the

8    struggles you've had, but at the bottom line, I've got

9    to protect the public.

10       It's not really -- I feel like I would like to

11   depart a little more or lower the sentence a little

12   more, but bottom line in my heart, I can't do it

13   because I feel like I have to protect the public.

14       What I'm going to do is I'm going to give you -- a

15   32 is the 210 to 262.  I'm going to give you two points

16   for acceptance, in my mind the equivalent of it, and

17   those two points are going to reflect both the fact

18   that you came in here and pled guilty, that you did

19   turn your -- convert four months ago -- we'll see how

20   long it lasts -- and that you have had such serious

21   psychological and difficult problems and that puts you

22   down to a 168 to 210 category.

23       But I'm not going to give you 168 because I think

24   that that's the benefit that you're going to get from

25   me from considering your past criminal history.  I'm

1    going to put you at 180 in this case.

2         That's a long time.  That's 15-year sentence.  And

3    it's not as long as the Government wanted and it's not

4    as short at your counsel wanted, but I'm hoping that by

5    the time you get out, you will have tired of this

6    enough and where you're going to be going, you'll be

7    going to a maximum security facility for sure based on

8    your history, and where you'll be going is not going to

9    be an easy road.  And you're going to have a lot of --

10   a lot of challenges ahead of you to face as far as

11   resisting other people and you want to stay on the

12   straight and try to get good time.

13        It's going to be a real struggle, but if you can

14   do that, you can reduce it every year about two months

15   off your sentence for good time and so that's all up to

16   you.  If you behave like you've been behaving in the

17   CCJ, you don't get that, so that's on you.

18        So it will probably be up to you as to whether you

19   get out when you're 50 or a little earlier and if you

20   can behave well, and turn your -- keep your conversion

21   and keep yourself on the straight and narrow, you'll do

22   a little bit better.

23        If you would stand, I'll impose the sentence.  The

24   defendant is hereby committed to the custody of the

25   United States Bureau of Prisons to be imprisoned for a

1    total term of 180 months.  The defendant is remanded to

2    the custody of the United States Marshal.  I'm going to

3    recommend you for the 500-hour comprehensive drug

4    treatment program.

5         Upon release from imprisonment, the defendant

6    shall be on supervised release for a term of -- I'm

7    going to give you five years supervised release.  Am I

8    able to do that?  I thought I had a five-year cap.

9         MS. MCELWEE:  It can be considered if it's

10   career offender.

11        THE COURT:  All right.  I'm going to put you

12   on supervised release for a term of five years.  The

13   defendant shall report to the probation office in the

14   district to which the defendant is released within

15   72 hours of release from the custody of the Bureau of

16   Prisons.

17        The defendant shall not commit another federal,

18   state or local crime.  The defendant shall not

19   illegally possess a controlled substance.  The

20   defendant shall cooperate in the collection of DNA as

21   directed by the probation officer.  The defendant shall

22   not possess a firearm, ammunition, destructive device

23   or any other dangerous weapon.

24        It's going to be a condition of your supervised

25   release that you pay restitution that remains unpaid at

1    the commencement of the term of the supervised release

2    in accordance with the schedule of payments set forth

3    in the criminal monetary penalty sheet of the judgment.

4        The defendant shall comply with the standard

5    conditions that have been adopted by this Court.  The

6    defendant shall also comply with the following

7    additional conditions:

8        The defendant shall provide his supervising

9    officer any requested financial information.  The

10   defendant shall not incur new credit charges or open

11   additional lines of credit without the supervising

12   officer's advanced approval.

13       The defendant shall participate in workforce

14   development programs and services as directed by the

15   supervising officer and, if not employed, shall perform

16   up to 20 hours of community service per week.

17   Workforce development programming may include

18   assessment and testing, educational instruction,

19   training classes, career guidance and job search and

20   retention services.

21       The defendant shall participate in mental health

22   treatment as directed by the supervising officer until

23   released from the program by the supervising officer.

24   The defendant shall pay or co-pay for services during

25   such treatment to the supervising officer's

1    satisfaction.

2         The defendant shall comply with the medication

3    program prescribed by a licensed medical practitioner.

4    The defendant shall inform any prescribing medical

5    practitioner that he's been convicted of a criminal

6    offense involving the illegal diversion of a narcotic

7    medication and shall provide the supervising officer

8    with written proof of such notice.

9         The defendant shall not use or possess any

10   controlled substance, alcohol or other intoxicant, and

11   shall participate in a program of drug and alcohol

12   abuse therapy to the supervising officer's

13   satisfaction.  This shall include testing to determine

14   if the defendant has used drugs or intoxicants.

15        The defendant shall submit to one test within

16   15 days of release from prison and at least two, but

17   not more than 120 tests per calendar year thereafter as

18   directed by the supervising officer.

19        The defendant shall pay or co-pay for services

20   during such treatment to the supervising officer's

21   satisfaction.  The defendant shall not obstruct or

22   tamper or try to obstruct or tamper in any way with any

23   tests.  And the defendant shall at all times readily

24   submit to a search of his residence and of any other

25   premises under his dominion and control by his

1    supervising officer upon the officer's request, when

2    the officer has reasonable basis to believe that such a

3    search will lead to the discovery of evidence of

4    violation of the terms of supervised release.  The

5    failure to submit to such a search may be grounds for

6    revocation.

7        A $100 special assessment is imposed.  The

8    defendant does not have the ability to pay a fine.  The

9    Court waives the fine in this case.  The defendant

10   shall make restitution to the following -- to the

11   Kennebunk Savings Bank in the amount of $1,298.

12   Restitution is to be joint and several with Jennica

13   Miller.

14       The Court finds that the defendant does not have

15   the ability to pay interest; the interest requirement

16   is waived.  Payments are to be made, first, to the

17   assessment and then to the restitution.  Payment of the

18   total criminal monetary penalty shall be due in full

19   immediately.  Any amount the defendant is unable to pay

20   now is due and payable during the term of

21   incarceration.

22       Upon release from incarceration, any remaining

23   balance shall be paid in monthly installments, to be

24   initially determined in an amount by the supervising

25   officer.  Said payments are to be made during the

1   period of supervised release, subject always to review

2   by the sentencing judge on request by either the

3   defendant or the Government.

4      I referred to the conditions of supervised

5   release.  I'm referring to the standard conditions.

6   Have you had an opportunity, Mr. Van Dyke, to go over

7   with the defendant those standard conditions?

8          MR. VAN DYKE:  I think he's read them, Your

9   Honor, but we don't have an objection if the Court

10   wants to read them now, but he has read them.

11          THE COURT:  I just want to make sure that you

12   have read them, Mr. D'Angelo, and that you understand

13   them.

14          THE DEFENDANT:  Yes, ma'am, I do.

15          THE COURT:  All right.  And do you understand

16   that those will also be applicable to you when you come

17   out on supervised release?

18          THE DEFENDANT:  I do, Your Honor.

19          THE COURT:  All right.  Mr. D'Angelo, you have

20   a right --

21          MS. MCELWEE:  Judge, I'm sorry to interrupt.

22          THE COURT:  Yes.

23          MS. MCELWEE:  You cannot put him on five

24   years.  It's a Class C felony and it's a three-year

25   maximum.

```
 1              THE COURT:  Even with a career offender
 2   status?
 3              MS. MCELWEE:  Yes.  Career offender guidelines
 4   don't count.
 5              THE COURT:  All right.  Well, thank you.  I'm
 6   going to have to give you three years of supervised
 7   release instead of the five.
 8          Let me just tell you this, Mr. D'Angelo.  If you
 9   come back to the state of Maine, the probation officer
10   is very good and supervised release is actually a good
11   thing for you.  It will allow you to get your life back
12   on track in a productive way.  They can help you with
13   getting set up with the treatment providers that you
14   need.  They can help you with getting -- you know,
15   continuing substance abuse if you need that.  They can
16   help you with work skills and getting a job.
17          So really, I give you supervised release because I
18   want to try to bridge you back into the community.  I
19   would have liked to have done it a little longer, but
20   use that time as a time to readjust and try not to
21   consider your supervising officer your enemy because
22   although they're law enforcement, they also are there
23   to help you get re-acclimated to the world outside of
24   jail.
25          I must advise you that you have the right to
```

1    appeal this conviction and sentence.  If you wish to do

2    so, and in order to effectively exercise your right of

3    appeal, you must cause to be filed with the clerk of

4    the court, within 14 days of today, and not after that,

5    a written notice of appeal; do you understand that?

6           THE DEFENDANT:  Yes, Your Honor.

7           THE COURT:  And I advise you that if you fail

8    to timely file a written notice of appeal, you will

9    have given up your right to appeal the sentence and

10   conviction; do you understand that?

11          THE DEFENDANT:  Yes, Your Honor.

12          THE COURT:  All right.  If you can't afford to

13   file the appeal, you can appeal without cost to you.

14   On your request, the clerk will immediately prepare and

15   file a notice of appeal on your behalf; do you

16   understand that?

17          THE DEFENDANT:  Yes, Your Honor.

18          THE COURT:  All right.  The defendant is

19   herewith remanded to the custody of the United States

20   Marshal for the District of Maine in execution of the

21   sentence imposed.

22       Is there anything more for the Government?

23          MS. MCELWEE:  No, Your Honor.  Thank you.

24          THE COURT:  Anything more for the defendant?

25          MR. VAN DYKE:  May I just make one inquiry?

1              (Discussion off the record between the

2    defendant and counsel).

3              Your Honor, I know the Court has recommended

4    the 500-hour program.  In the event that BOP does not

5    follow that recommendation, which is not binding, we

6    would just ask or put on the record the fact that Mr.

7    D'Angelo believes that one of his issues in life has

8    been a failure to stay compliant within institutions

9    and that he would ask that he be considered placed to a

10   facility that does have a psychiatric facility

11   associated with it, such as Fort Devens, something that

12   has a psychiatric component to it, to allow him to

13   remain compliant to the extent possible.

14             THE COURT:  I would recommend that the

15   defendant be placed at a facility that can deal with

16   his mental and physical health needs.  I don't think

17   he's going to qualify for Devens though.

18        All right, is there anything more than from the

19   defendant?

20             MR. VAN DYKE:  Nothing, Your Honor.

21             THE COURT:  All right.  The Court will be in

22   recess.

23             (End of proceeding)

24

25

1               **C E R T I F I C A T I O N**

2   I, Dennis Ford, Official Court Reporter for the United

3   States District Court, District of Maine, certify the

4   foregoing is a correct transcript from the record of

5   proceedings in the above-entitled matter.

6   Dated:  August 6, 2014

7               /s/  Dennis R. Ford

8               Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25